IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM AND LISA VALESKY, | ) | |
| On behalf of their minor child, and | ) | |
| | ) | |
| LISA VALESKY, an individual, | ) | |
| | ) | Civil Action No. 09-800 |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AQUINAS ACADEMY, THE ROMAN | ) | |
| ARCHDIOCESE OF GREENSBURG, and | ) | |
| NOURREDINE DESLAM, an individual, | ) | |
| | | |
| Defendants. | | |

AMBROSE, Senior District Judge

**OPINION AND ORDER**

Plaintiffs claim in this action that Jane Doe was sexually abused by defendant Nourredine Deslam ("Deslam"), a maintenance employee at defendant Aquinas Academy ("Aquinas"), while she attended kindergarten at the school.  Plaintiffs have alleged that Aquinas and Defendant the Diocese of Greensburg (the "Diocese") violated Jane Doe's rights under Title IX by failing to protect her from Deslam once they received notice of his misconduct.  Plaintiff Lisa Valesky further claims that Aquinas and the Diocese violated her rights under Title IX when they banned her from Aquinas in retaliation for her allegations against Deslam.  Defendants have moved for summary judgment dismissing Plaintiffs' claims on the grounds that (1) the Diocese and Aquinas are not subject to the requirement of Title IX because they are not recipients of federal financial assistance; (2) the Diocese is a separate entity from Aquinas and has no liability as an employer

under Title IX; (3) Plaintiffs have failed to submit sufficient evidence of sexual abuse or harassment to support their Title IX claim; and (4) Defendants had a legitimate reason unrelated to her complaints to deny Lisa Valesky the opportunity to volunteer in the cafeteria.  For the reasons set forth below, I grant Defendants' motion for summary judgment.

## I.  Legal Standard

In order to succeed on a motion for summary judgment, a moving party must demonstrate that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  A fact is material when it might affect the outcome of the suit under the governing law."  Scott v. Airtran Airways, Inc., No. 05-1123, 2006 WL 2711654, at *2 (W.D. Pa., 2006); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If the party moving for summary judgment will not bear the burden of proof at trial, it may meet its initial burden by showing that the evidence on record would not be sufficient for a reasonable jury to find in the non-movant's favor.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Once the party moving for summary judgment has carried the initial burden  . . . , the nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact.  Instead, it must 'make a showing sufficient to establish the existence of every element essential to its case . . . .'"  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  "A nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings."  Williams v. Borough of West Chester, Pa, 891 F.2d 458, 459 (3d Cir. 1989).

"Thus an opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993). Rule 56 requires the granting of a motion for summary judgment after adequate time for discovery against the party who fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Scott, 2006 WL 2711654, at *1 (quoting Celotex, 477 U.S. at 322).

## II.  Statement of Relevant Facts[1]

### Facts Relating to Whether Defendants Are Subject to Title IX

Aquinas is organized as a charitable trust and is one of fifteen private, Catholic elementary schools that operate within the Diocese.  Trent Bocan ("Bocan") has been the Superintendent of Catholic Schools and the Managing Director for the Office of Catholic Schools for the Diocese since August 2006.  He is an employee of the Diocese, was appointed by the Bishop, and reports to the Bishop and the Vicar General of the Diocese.  (Docket No. 76-2, at 8-9, 12-13.)  The Office of Catholic Schools is a ministry of the Diocese, and Bocan acts as a trust advisor to the elementary schools, advising on policy, operations, assisting with the budgetary process and the hiring of personnel.  (Id. at 16, 25.)  As the managing director for the Office of Catholic Schools, he acts on behalf of the Bishop relative to the direction of education within the Catholic schools.  (Id. at 13.)  Since the schools were re-organized as charitable trusts in 2008, Bocan has had more control over the schools because he is in a direct consulting supervisory role relative to the school principals.  (Id. at 22.)  The Office of Catholic Schools

---

[1] Unless otherwise indicated, all facts have been agreed to by the parties in connection with this motion.  [See Docket Nos. 73, 81.]  To the extent that I have considered additional facts contained in the record, I have included citations to the record.

has a handbook of policies applicable to the elementary schools, similar to what a school district would have, defining policies for such areas as employees, students, and field trips.  (Id. at 40.)

The Bishop of the Diocese is the trustee of each of the schools.  (Id. at 19.)  Each of the schools also has a Board of Trust Administrators composed of the pastors that are closest in proximity to the school or have the largest sending history from their parishes to that school.  (Id. at 42.)  The Diocese taxes the parishes within it, which includes an assessment that supports the Catholic schools within the Diocese.  (Id. at 19.)  The Bishop approves the funding mechanism of taxing the assessment of parishes for the dissemination of funds, the collection and redistribution of funds through the Diocese offices to the schools, and the religious education curriculum. (Id. at 49.)  The Diocese provides payroll services to its schools.  (Id. at 15.)  The elementary schools, including Aquinas, are connected with the Diocese via an intranet. (Id. at 37.)   In the event an elementary school would seek to close, the Board of Trust Administrators of the school would make such a recommendation, but the Bishop would have to approve the recommendation.

The Diocese employs a Director of Information Technologies whose office supports the Diocesan network infrastructure, telecommunication infrastructure, including those for the schools of the Diocese.  (76-4, at 5.)  With respect to Aquinas, it provides the help desk, purchases standard equipment for them, troubleshoots, and edits and submits their technology plan objectives for the E-rate application.  (Id. at 7.)

The E-Rate Program is a federal program that allows schools, consortiums and public libraries to receive discounts on telecommunications and hardware and services that are for telecommunications.  (Id. at 14.)  The Diocese participates in the E-Rate program, including assisting the schools in applying for the program by acting as a lead education agency.  (Id. at

14.)  Essentially, the Diocese walks the schools, including Aquinas, through the application

process and the Office for Catholic Schools handles the administrative portion of determining the

amount of the discount. (<u>Id.</u> at 15.)  The Diocese also received a matching E-Rate grant to

establish the Central Regional Consortium.  (<u>Id.</u> at 17.)  The Diocese insures that its schools

comply with the Content Internet Protection Act, required by the Federal government as a

condition of receiving discounts on internet service.  (<u>Id.</u> at 34-35.)

Certain of the schools within the Diocese participate in the National School Lunch

Program, including Geibel Middle and High School and several elementary schools.  Aquinas

itself does not participate directly in the National School Lunch Program.  In addition, the E-Rate

discount is based in part on the participation rate of Diocesan schools in the National School

Lunch Program.  (<u>Id.</u> at 22.)

## **Facts Relating to Liability Under Title IX**

Beginning in the fall of 2008, Jane Doe attended kindergarten at Aquinas.  Her teacher

was Annette Ustazewski ("Ustazewski").  At the time, Jane Doe's two older siblings also

attended Aquinas.  Deslam was the maintenance man at Aquinas.  During the lunch periods, he

was responsible for emptying the trash containers and cleaning up the cafeteria.  He was also

responsible for maintaining the restrooms during the day.

William and Lisa Valesky, Jane Doe's parents, frequently volunteered in the Aquinas

lunchroom during their children's lunch periods.   Lisa Valesky testified that, in September 2008,

while volunteering in the lunchroom, she witnessed Deslam standing over the kindergarten

students, going through their lunch boxes and telling them to eat.  (Docket No. 75-2, at 43.)  That

Deslam engaged in such behavior was confirmed by Alice Galando, another kindergarten teacher

at Aquinas.  (Docket No. 78-7, at 29) (Deslam would "gently tease children, reminding them to

eat their fruits, sandwiches, et cetera and not to start with candy treats.") Diane Dubosky ("Dubosky"), a lunchroom monitor employed by Aquinas, testified that the kids love Deslam and sometimes call him over to their tables. (Docket No. 78-2.) Lisa Valesky admitted that Deslam's actions occurred in plain view of a half dozen adults and all the children, and that only she, her husband and Jane Doe were bothered by his conduct. (Docket No. 75-2, at 56.)

According to Lisa Valesky, she commented to Dubosky about Deslam's actions. (Id. at 42.) Lisa Valesky testified that she told Deslam to stay away from her daughter because he was scaring her, and that, in response, Deslam snickered in her face and walked away. (Id. at 44.) She repeated her complaints to Cheryl Rullo ("Rullo"), the principal, and to Ustazewski. William Valesky testified that he also witnessed Deslam's conduct and complained to Dubosky, who replied that Deslam was "harmless." (Docket No. 75-3, at 28-9.) Dubosky confirmed this conversation. (Docket No. 78-2, at 27.) Both Rullo and Ustazewski deny that the Valeskys made any complaints to them regarding Deslam during September or October 2008. (Docket No. 78-6 at 42; Docket No. 76-1, at 107.) While not specifying any date, Deslam testified that Lisa Valesky complained to him that they do not tell kids to eat in their house, and that he did not respond and just walked away. (Docket No. 78-1, at 108.) A day or two later, Rullo informed him that she had received a complaint and directed him not to tell the children to eat anymore, to which he agreed. (Id.)

Lisa Valesky submitted a "Bullying, Harassment or Intimidation Report Form ("BHI Form"), dated September 26, 2008.[2] The form states that during "the entire month of September.

---

[2] Rullo testified that she never received this form. (Docket No. 76-1, at 55.) The form is not signed by Rullo or any other school personnel. (Pl. Ex. 29.) Rullo further testified that, in order to obtain one of these forms, they must specifically be requested from her, and that she mailed a blank form to Lisa Valesky in June 2009 in response to her complaint that her older

. .[Deslam] goes to [Jane Doe's] table every day at lunch.  He touches her and goes through her lunch box.  He tells her that she has to eat all of her food.  She is terrified of him.  She starts to cry as soon as he gets close to the table.  My husband and I have both complained to Mrs. Dubosky and she told us that he is harmless.  I have also told Mrs. Ustazewski that he is upsetting [Jane Doe] and she said that he is just being nice.  I told [Deslam] stay away from her because he is scaring her and he laughed at me.  I think it is inappropriate for the janitor to be touching and scaring my five year old daughter every day that she is in school." (Pl. Ex. 29.) William Valesky testified that he did not believe the BHI form identified any sexual misconduct of any kind.  (Docket No. 75-3, at 40, 93.)

According to Lisa Valesky, in October 2008, Jane Doe began expressing that she did not want to go to school.  (Docket No. 75-2, at 17.)  She had not received a response from the school regarding her BHI form.  (Id. at 51.)  On November 6, 2008, Lisa Valesky's mother, Betty Iannuzzo ("Iannuzzo") received a phone call from Dubosky, informing her that Jane Doe was in the lunch room crying hysterically.  (Docket No. 78-8.)  Dubosky denies ever seeing Jane Doe cry in the lunch room.  (Docket No. 78-2, at 31.)  When Lisa Valesky arrived at school, she testified that she found Jane Doe sitting on another parent's lap, hyperventilating and pale. (Docket No. 75-2, at 68.)  Lisa Valesky stated that Jane Doe told her that "we are not safe." (Id. at 70.)  According to Lisa Valesky, while she was holding Jane Doe and trying to figure out what was happening, Rullo came over and started yelling at Jane Doe that "I told you that your parents are the only ones you have to listen to" and about how people who lived during the Holocaust believed you have to eat all your food.  (Id. at 70.)  At that time, Lisa Valesky believed that her daughter was upset because of what Deslam had been doing in the cafeteria. (Id.)  Lisa Valesky

daughter, A.V., was being harmed by a fifth grade teacher.  (Id. at 40-41, 56.)

took her daughter home, and then returned to the school.  At that time, she testified that she overheard Rullo telling Deslam that "this is nonsense."  (Id. at 71.)  That day, November 6, 2008, was the last day that Jane Doe attended Aquinas.

On November 8, 2008, according to the Valeskys, Jane Doe drew a picture of the girls' restroom at Aquinas with six of her classmates and a man in the picture.  (Docket No. 75-3, at 48.)  When William Valesky asked who the man in the bathroom was, he testified that Jane Doe identified the man as Deslam.  (Id.)  When he and his wife questioned Jane Doe about Deslam's presence in the bathroom, William Valesky testified that Jane Doe told them that he comes into the bathroom "and he makes the toilets dirty and then cleans them."  (Id. at 49.)  Lisa Valesky testified that when she asked Jane Doe whether he touched her, Jane Doe replied that "he touches all of us." (Docket No. 75-2, at 22.)  William Valesky further testified that Jane Doe told him that she was beside the sink and Deslam was touching her, and that he touched her in her private area.  (Docket No. 75-3, at 49.)  He stated that, until that evening, he had no knowledge or understanding that anything sexual had occurred between Deslam and his daughter. (Id. at 52.)[3]

The following Monday, November 10, 2008, the Valeskeys called their primary care physician and made an appointment for Jane Doe for the following day.  On November 11, 2011, Jane Doe and Lisa Valesky met with Amy Dillon ("Dillon"), a pediatric nurse practitioner.  (Docket No. 78-3, at 6.)  According to Dillon's notes, Lisa Valesky had discussed "school anxiety issues," including "outbursts of crying at lunch," fearfulness, and that Jane Doe had told her mother that they had to "leave now they were in danger." (Pl. Ex. 42.)  Lisa Valesky told Dillon that Jane Doe had drawn a picture showing the janitor in the bathroom while Jane Doe

---

[3] This testimony is inconsistent with Lisa Valesky's testimony that, as of November 13, 2008, Jane Doe had still not provided them with any details of a sexual nature.  (Docket No. 75-2, at 28.)

was in the bathroom.  Jane Doe was quiet but cooperative during the exam, and no bruising was noted (Docket No. 78-3, at 18.)  Dillon did not conduct a gynecological exam.  (Id.)  When Dillon asked Jane Doe whether anyone had touched her under her pants, she denied it.  (Pl. Ex. 42.)  Jane Doe also told Dillon that the janitor "comes to the cafeteria and makes them eat all their lunch." (Id.)  Dillon testified that "she was concerned that there was something going on in school because [Jane Doe] was obviously making statements that a five year old would not just think to make up," and Dillon gave Lisa Valesky a referral to the Children's Advocacy Center at Children's Hospital in Pittsburgh.  (Docket No. 78-3, at 18.)

On November 11, 2008, William Valesky called Aquinas to set up a meeting with Rullo regarding Jane Doe.  The record contains conflicting evidence as to who informed Rullo that Deslam had allegedly been in the restroom with Jane Doe.  Rullo's notes indicate that she ran into Lisa Valesky at lunch and that Lisa Valesky "made insinuation that [Jane Doe] was in bathroom at same time that Mr. Deslam." (Pl. Ex. 31.)  Lisa Valesky testified that her husband may have mentioned that when he called the school to set up the meeting.  (Docket No. 75-2, at 83.)  In any event, Rullo then requested that the Kindergarten teachers and Dubosky write notes regarding their bathroom procedures and whether they had ever witnessed Deslam in or around the restrooms.  (See Pl. Exhs. 33, J, K and L.)  All denied having seen Deslam in the restroom with the children.  (Id.)[4]

On November 13, 2008, Lisa and William Valesky met with Rullo and Vice Principal Daniel Mahoney ("Mahoney").  The Valeskys told Rullo that Deslam had touched Jane Doe in the restroom, although they did not indicate that it was sexual in nature. (Docket  No. 75-2, at

---

[4] There is also conflicting evidence as to whether kindergarten children were permitted to go into the restroom unaccompanied.

28.)   According to Lisa Valesky's testimony, at this time they were still trying to sort out what had occurred and Jane Doe had not yet told them any further details.  (Id.)[5]  During the meeting, the Valeskys filled out another BHI form describing "inappropriate invasion of personal space" and that Deslam "was allegedly in the girls' restroom while [Jane Doe] was there.  He told her to eat her food at lunch." (Pl. Ex. 30.)  This form was signed by Lisa Valesky, Rullo and Mahoney. (Id.)  As Jane Doe was not attending school at this time, Rullo agreed to meet Jane Doe at the entrance to the school, beginning the following week.  At the end of the meeting, Rullo informed the Valeskeys that Deslam would not be in the cafeteria with their children, would not speak directly to their children, and would avoid the kindergarten floor.   Rullo testified that she felt that the Valeskys understood that her investigation regarding whether Deslam could have been in the bathroom alone with Jane Doe had concluded that it had not occurred, and that they were satisfied and planned to return Jane Doe to school on Monday.  (Docket No. 76-1, at 159.)

Lisa Valesky testified that, at some point subsequent to this meeting, Jane Doe told her in greater detail about Deslam's inappropriate sexual contact in the bathroom.  (Docket No. 75-2, at 24, 26.)  Jane Doe did not return to school that Monday, and Lisa Valesky testified that she saw Rullo at the end of the day on Monday and told her that Jane Doe would not be coming back as long as Deslam was at the school.  (Id. at 38.)  She called Bocan and arranged to meet with him on November 24, 2008.  (Docket No. 76-2, at 135.)

On November 24, 2008, Bocan met with Lisa and William Valesky and Lou Iannuzzo, Lisa Valesky's father.  During this meeting, Lisa Valesky indicated concerns over Deslam telling students to eat during the lunch period and allegedly being in the bathroom with Jane Doe and

---

[5]Lisa Valesky also testified that Jane Doe had told them that Rullo had seen Deslam in the bathroom with her, but Lisa Valesky never shared that information with Rullo.  (Docket No. 75-2, at 34.)

other students.  Bocan's notes from the meeting do not indicate that anything further was discussed regarding the nature of Deslam's interaction with Jane Doe. (See Pl. Ex. 36.)  At the end of the meeting, Bocan had devised an investigative plan for Jane Doe's return to Aquinas, which included:  (1) obtaining records from alleged counseling sessions; (2) interviewing Jane Doe with her parents present; (3) Jane Doe returning to school after Thanksgiving break; (4) keeping Deslam out of Aquinas during the investigation; and (5) upon completion of the investigation, plans for keeping Jane Doe within the supervision of a paid employee at all times were Deslam to return to work.  Bocan conveyed this plan to Rullo. (Pl. Ex. X.)  Deslam was placed on paid administrative leave on November 24, 2008.  When Rullo informed Bocan that Deslam had not been in the bathroom with Jane Doe, Bocan testified that he told her: "if somebody's telling that somebody- a child is scared of an adult and we're putting that person on administrative leave, we don't know exactly what has happened and that is why we are investigating.  So you don't want to make an absolute statement like that right off the bat because you haven't investigated, so you know that."  Apart from placing Deslam on administrative leave, there is no evidence in the record as to what, if anything, Defendants did in the week immediately following that meeting to further investigate Plaintiffs' allegations.

On December 2, 2008, William and Lisa Valesky took Jane Doe to the Greensburg Police Department to report their allegations.  According to the Incident Investigation Report, the Valeskys told Detective Jerry Vernail ("Vernail") about the picture that Jane Doe had drawn the first week of November, and reported that "when they questioned [Jane Doe] as to why he may have been in the bathroom she did not reveal anything further other than to say he had been in there more than once and there were other girls present from her coloring group as well." (Docket No. 71-7, at 23.)  The report also stated that "the Valesky's feel that Deslam has been

too close to other children which they witnessed and related to Principal Cheri Rullo.  They also

stated that Deslam has been moved out of Aquinas after they contacted the Superintendent."

(Id.)  Vernail concluded that he would attempt to have Jane Doe scheduled for a forensic

interview after consulting the Children's Bureau and District Attorney's Office.  (Id.)

On December 5, 2008, a message from an anonymous caller to Catholic Charities was

forwarded to Persico, the Vicar General of the Diocese.  (See Pl. Ex. 37.)  The message stated:

> Mary, receptionist at Catholic Charities, received a call today from a
> woman stating that she has left messages for Msgr. Persico regarding the fact that
> her five year old daughter was sexually assaulted in the bathroom at Aquinas
> Academy by a staff member.  She did not give her name. . . .This woman said that
> Aquinas Academy will not permit her in the building.  This woman was on the
> verge of tears stating that she does not want to go public with this information but
> will if she does not hear from Msg. Persico.  . . ."

After receiving this message, Persico called Bocan into his office.  (Docket No. 76-3, at

19.)  Based on their suspicion that the call was from the Valeskys, they placed a call to

the Valeskys' home.  Persico testified that he was confused as to what exactly the

allegations were during the conversation, so after the call ended, he instructed Bocan to

contact the Westmoreland County Children's Bureau "to move it into an independent

investigation and let them sort it out."  (Docket No. 76-3, at 28.)  According to the Report

of Suspected Child Abuse form, Bocan relayed the following information to the

Children's Bureau:

> Mother reported these allegations to the school before Thanksgiving 2008.
> Within the past month the janitor of the school was in the girls (sic) restroom
> while this child and other children were present.  Today the child disclosed to
> mother that this man sexually assaulted her.  The mother then recanted that she
> said that.  No other specifics of the assault were reported.  The mother says that
> the school is covering the incident up.  The janitor has been suspended until
> further notice.  The M has removed the child from the school.

(Pl. Ex. 38).

A forensic interview of Jane Doe was conducted by Cindy Byers from A Child's Place at Mercy Hospital on December 8, 2008.  On December 9th, Vernail contacted Rullo who provided him with the names and contact information for the other children identified by Jane Doe. (Docket No. 71-7, at 24.)  Interviews of two of the children identified were conducted on December 15 and December 17, 2008.  Rullo also provided additional contact information when requested by Vernail.  (Docket No. 71-7, at 25.)  Vernail questioned the parents of the remaining children and was informed that there was no indication of any problems with respect to their daughters. (Docket No. 71-7, at 26-27.)  On January 7, 2009, Vernail interviewed Deslam, who denied the allegations and agreed to take a voice stress test.  (Id. at 27.)  The test was performed on January 12, 2009, and Deslam passed the test.  (Docket No. 71-9, at 20.)  On January 20, 2009, Vernail interviewed the kindergarten teachers at Aquinas.  (Docket No. 71-7,  at 28.)

On January 27, 2009, Vernail and an Assistant District Attorney met with the Valeskys and their attorney to inform the Valeskys that the case would be closed without prosecution due to the fact that no corroborating evidence was found.  (Id. at 28.)  Rullo was notified by the Greensburg Police Department and the District Attorney's Office that after completing their investigation, Plaintiffs' allegations against Deslam were unfounded, and that no charges were going to be filed against him.  Persico was aware that neither the Greensburg Police Department nor the Westmoreland County District Attorney's Office could find any proof of sexual assault. Persico and Bocan each testified that they relied on the investigation and conclusions of the police department and District Attorney's office.  (Docket No. 76-3, at 35-36; Docket N. 76-2, at 168-69.)  On February 5, 2009, Bocan and Rullo sent a letter to Plaintiffs indicating that Deslam would be returning to his position at Aquinas and inquiring as to whether Jane Doe would be returning to school.  Bocan explained:  "[A]t that point we felt that we could no longer hold out

an employee from a right to work if that employee had not been verified as having done anything

inappropriate.  So we had to bring him back."  (Docket No. 76-2, at 171.)

Deslam returned to work at Aquinas in February 2009.  Even after his return, Plaintiffs

continued to have their two older children attend Aquinas.

**<u>Facts Relating to Retaliation</u>**

During the beginning of the 2008-09 school year, Lisa Valesky frequently served as a

lunch volunteer at Aquinas.  Dubosky was a lunch monitor at Aquinas at that time.  The duties of

the lunch monitors are to keep the cafeteria running smoothly and to help any children that

required help.  The role of the lunch volunteer is explained to parents by a chairperson of the

lunch monitor process.  Volunteers are told that, if they have an issue, they should speak with

one of the monitors or Mahoney, who also served lunch duty.  As a lunch monitor, Dubosky was

empowered to use her discretion in bringing lunchroom incidents to her direct supervisor, Rullo.

Dubosky would handle typical situations on a daily basis, without the need to report them to

Rullo.

In October 2008, J.H. was in the fifth grade at Aquinas.  J.H testified that, on October 22,

2008, Jane Doe said the 'F-word' at lunch after Lisa Valesky, who was working as a lunch

volunteer that day, walked away from the lunch table.  Having heard Jane Doe use this word,

J.H. told one of her friends what had transpired.  In turn, this unidentified friend told Lisa

Valesky's other daughter, who then told Lisa Valesky.  Dubosky testified that she saw Lisa

Valesky pointing her finger close to J.H.'s face and screaming at her.  Dubosky was unaware of

what led up to this incident.

Rullo was approached by Dubosky who began to inform her of the incident that had

occurred in the cafeteria between J.H. and Lisa Valesky.  This conversation was aborted when

Lisa Valesky approached and proceeded to tell Rullo her version of the incident.  Lisa Valesky

explained to Rullo what she had been told by her older daughter and that, in turn, she had spoken

with J.H. about not using such language and refraining from spreading rumors.  Rullo indicated

to Lisa Valesky that it was not her responsibility as a volunteer to correct, punish or yell at a

student.  Valesky indicated that she had not yelled at J.H. in any way.  Based on Lisa Valesky's

reporting of the incident, Rullo did not feel there was a need to pursue the issue further at that

time.

   Later that day, Lisa Valesky also initiated a conversation with Renee Howard

("Howard"), J.H.'s mother, at her place of business, indicating that there had been an incident

between the "girls" in the lunchroom.  According to Lisa Valesky, J.H. accused Jane Doe of

saying the 'F-word.'  Howard testified that Lisa Valesky told her that she had spoken to J.H.

about the incident and had also informed Rullo.

   When J.H. got off the school bus at the end of the day, she cried while relating the

incident to her mother.  Howard testified that over the next few weeks, she did her own

investigation into what had actually happened, speaking with J.H. and her husband.  Howard

testified that she wondered why her family had not heard anything from Rullo regarding the

incident.  John Prorok ("Prorok"), J.H.'s father, testified that he was under the impression that

the incident had been reported to Rullo by Lisa Valesky and that Rullo would "take care of it."

According to Howard, over the next few weeks, Lisa Valesky stopped at Howard's place of

business on two occasions to discuss issues related to the Diocese.  The parties dispute whether,

on the last visit in November 2008, Lisa Valesky began calling J.H. a liar and whether Howard

had to threaten police intervention to get Lisa Valesky out of the store.

On November 18, 2008, Bocan received a complaint from Prorok alleging that Lisa Valesky yelled at his daughter in the lunchroom and grabbed her by the shoulders and neck in October 2008. In response, Bocan sent an email to Rullo instructing her to investigate Prorok's allegations. This email directed that, if Prorok's allegations were substantiated, Lisa Valesky should no longer be permitted to volunteer in the building. (Pl. Ex. 34.)

Rullo conducted an investigation by interviewing people who would have been present in the lunchroom during the incident. She did not find any witness to support or substantiate that Lisa Valesky ever laid her hands on J.H. (Docket No. 76-1, at 215.) However, every witness indicated that Lisa Valesky's response to J.H. consisted of "yelling at her in her face, screaming at her, was over the top." (Id.) Rullo concluded that, since Lisa Valesky had not laid hands upon J.H., but still behaved inappropriately, she should be banned from volunteering in the lunchroom, but not completely banned from volunteering in any capacity in the building. (Id. at 218.) She notified Lisa Valesky of this determination by phone. (Id. at 219.)

Subsequent to her notifying Lisa Valesky that she could no longer volunteer in the lunchroom, Rullo had a conversation with Michelle Finoli ("Finoli"), the school librarian at Aquinas. (Id. at 220.) Lisa Valesky had told Finoli that she (Lisa) was banned from the school premises. (Docket No. 78-5, at 16.) In response, Rullo sent a letter to Lisa Valesky reiterating that Lisa Valesky would no longer be permitted to act as a lunchroom monitor. (Pl. Ex. V.) She clarified that "I, at no time, stated that you were not welcome or permitted in the school. It has come to my attention that this is the impression you are under and it is important to clarify this incorrect assumption." (Id.) Lisa Valesky acknowledged that the alleged banishment may have been her "misconception."

### III.  Defendants' Motion for Summary Judgment

#### A.  Applicability of Title IX to Defendants Diocese and Aquinas

"Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a),
provides that 'no person in the United States shall, on the basis of sex, be excluded from
participation in, be denied the benefits of, or be subjected to discrimination under any education
program or activity receiving Federal financial assistance." Nat'l Collegiate Athletic Ass'n v.
Smith, 525 U.S. 459, 465-66 (1999).  There is no dispute that Plaintiffs' allegations, if proven,
would constitute a violation of Title IX.  Rather, the Diocese and Aquinas argue that they cannot
be held liable under Title IX because they are separate legal entities, neither of which are
recipients of Federal financial assistance.  Plaintiff responds that the Diocese and Aquinas should
be considered one educational system under Title IX, and that the system does receive Federal
financial assistance for purposes of Title IX.

In 2002, Congress enacted the Civil Rights Restoration Act, 20 U.S.C. §1687, in part, to
broaden the definition of "program or activity" under Title IX.  Section 1687 provides, in the
context of non-public educational institutions, that "the term 'program or activity' and 'program'
mean all of the operations of. .. "a[n] other school system."  20 U.S.C. §1687(2)(B); 29 U.S.C.
§794(b)(2)(b).  In other words, if any part of a covered school system receives Federal financial
assistance, then all the operations of that school system are subject to the provisions of Title IX.
NCAA, 525 U.S. at 466; see also, Russo v. Diocese of Greensburg, 2010 WL 3656579, at *4
(W.D. Pa. Sept. 15, 2010) ("the prohibition on discrimination applied to the entire institution and
all of its operations, programs, and activities whenever it received any federal funds at all").[6]

---

[6] I find it inexcusable that Defendants did not in any manner mention my colleague's
recent opinion in Russo, which also involved a Title IX action against the Diocese of

Consistent with this approach, federal regulations define a "recipient" of federal financial assistance as

> any public or private agency, institution or organization, or any person, to whom Federal financial assistance is extended *directly or through another recipient* and which operates an educational program or activity which receives or benefits from such assistance, including any subunit, successor, assignee, or transferee thereof.

34 C.F.R. §106.2(h) (emphasis added).  "Thus, an entity may receive federal financial assistance indirectly and still be considered a recipient for purposes of Title IX."  Smith v. Nat'l Collegiate Athletic Ass'n, 266 F.3d 152, 160 (3d Cir. 2001).

Neither party has cited any authority addressing whether a diocese and one of the Catholic schools affiliated with that diocese constitute one school system for the purposes of Title IX, nor have I found any such authority.  Defendants rely entirely on the fact that the Diocese and Aquinas, as well as the other Catholic schools affiliated with the Diocese, are each organized as independent charitable trusts.  (Def. Opp. Br. at 6.)  However, as the Sixth Circuit has explained, "Congress has made clear its intent to extend the scope of Title IX's equal opportunity obligations to the furthest reaches of an institution's programs.  We will not defeat that purpose by recognizing artificial distinctions in the structure or operation of an institution."  Horner v. Kentucky High School Athletic Ass'n, 43 F.3d 265, 272 (6th Cir. 1994), cert. denied, 531 U.S. 824 (2000).  I agree that the Diocese and Aquinas may not rely solely on their legal status to shield them from their obligations under Title IX.

---

Greensburg, in which the Diocese was represented by the same counsel as herein, and which was decided prior to the submission of summary judgment in this case.  I will address Russo more thoroughly in subsequent sections, but I note both this potential ethical violation on the part of counsel for the Defendants, and their substantive error in failing to provide me a basis to distinguish a case which otherwise appears quite on point and to their detriment.

In <u>Russo</u>, the plaintiffs asserted, <u>inter alia</u>, a Title IX claim against the Diocese and

Greensburg Central Catholic High School ("GCCHS").  It was undisputed by the parties that

Geibel, another high school in the Diocese, as well as several elementary schools, participated in

the National School Lunch program.  The court explained that:

> We must determine Geibel's legal status under state law in order to decide what
> the operative 'other school system' is for purposes of Title IX and the
> Rehabilitation Act's definition of 'program or activity.'  If Geibel has the legal
> status of being its own, independent 'other school system,' then its participation in
> the NSLP would have no effect on the Diocese or GCCHS.  If it does not have
> such legal status, then the Diocese must be the operative 'other school system' for
> purposes of Title IX and the Rehabilitation Act.  In that case, Geibel's receipt of
> Federal Financial Assistance is imputed up the organizational chart to the
> Diocese, and across to the organizational chart to its fellow Diocesan high school,
> GCCHS.

2010 WL 3656579, at *6.  Because "the Diocese and GCCHS have consistently represented to

this court that neither of these Diocesan high schools are separate legal entities," and "Geibel has

no legal status separate from the Diocese, the Diocese is the operative 'other school system'

under Title IX and the Rehabilitation Act.  As such, Geibel's receipt of Federal Financial

Assistance, in the form of NSLP subsidies, is imputed to both the Diocese and GCCHS."  <u>Id.</u>

Defendants, by failing to discuss my colleague's opinion in <u>Russo</u>, gave me no factual basis to

distinguish the holding in <u>Russo</u> that the Diocese constitutes an 'other school system' for

purposes of Title IX.

In <u>Smith</u>, the Third Circuit held that the NCAA could be subject to Title IX based on the

receipt of federal financial assistance by the National Youth Sports Program ("NYSP") and the

National Youth Sports Program Fund ("Fund").  266 F.3d at 160.  The Court based its holding on

the allegations that:  (1) the NYSP Committee was an NCAA committee responsible for the

administration of the NYSP; (2) the Council of the NCAA limited the powers of the Fund's

Board of Directors; (3) the Executive Director of the NCAA and the chairperson of the NYSP

Committee were *ex officio* members of the Fund's Board of Directors; (4) all of the members of

the Fund's Board were either employees of the NCAA or members of the NCAA's NYSP

Committee; (5) the Fund had to report to the Council of the NCAA on an annual basis; (6) upon

dissolution of the Fund, its assets will be distributed exclusively to the NCAA; and (7) the

NCAA's Executive Director remarked that the NYSP is 'one of the NCAA's best kept secrets.'

Id. at 161.

Analyzing the facts before me within this legal framework, it would be facially

implausible to consider Aquinas its own school system, independent of the Diocese, for purposes

of Title IX.  As set forth in greater detail in Section II above, the elementary schools, including

Aquinas, are closely managed by the Diocese.  The Superintendent of the schools is appointed by

the Bishop and is an employee of the Diocese.  He serves as trust advisor for the elementary

schools, while the Bishop serves as a trustee.  Each school has a Board of Trust Administrators

composed of pastors from within the Diocese, and presumably, answerable to the Bishop.  Only

the Bishop can authorize a school to close.  The Office of Catholic Schools, which is a ministry

of the Diocese, provides a handbook of policies applicable to the elementary schools defining

policies for such areas as employees, students and field trips.  Bocan testified that one result of

the schools being re-organized as independent charitable trusts was that the Diocese could

exercise *more* control over them.  From a financial perspective, the Diocese collects money from

each of its parishes which it bundles and divides among the Diocesan schools.  It provides

further support in the form of payroll services, an intranet, telecommunications and purchases

standard information technologies equipment.  Given the extensive involvement, both

administratively and financially, of the Diocese with the Diocesan schools, including Aquinas, I

20

find that the Diocese constitutes an "other school system" for purpose of Title IX.  Cf. O'Connor

v. Davis, 126 F.3d 112, 118 (2d Cir. 1997) (hospital not affiliated with university for purposes of

Title IX where "the two entities have no institutional affiliation; there is no written agreement

binding the two entities in any way; no staff are shared; [and] no funds are circulated between

them"), cert. denied, 522 U.S. 1114 (1998); Buckley v. Archdiocese of Rockville Ctr., 992 F.

Supp. 586 (E.D.N.Y. 1998) (Diocese and Catholic school, which did not receive federal

assistance, could not be liable under Title IX based on receipt of federal assistance by public

school district, where there was no formal institutional affiliation or agreements between the

district and Catholic school nor any evidence that they share funds).   Accordingly, if any school

within the Diocese receives Federal financial assistance, then the Diocese and all the schools

within it are subject to the provisions of Title IX.

       Having found that the Diocese and the Diocesan schools constitute an "other school

system" for the purposes of Title IX, I must next determine whether this other school system

receives Federal financial assistance.  In Russo, the court considered whether the Diocese's

participation in the E-Rate program and Geibel Catholic Middle-High School's participation in

the National School Lunch Program rendered the Diocese and GCCHS, its other high school,

recipients of Federal financial assistance for purposes of Title IX.  Examining the programs and

nature of the schools' participation, the court held that, since the Diocese and its high schools

constitute one school system, then Geibel's participation in the National School Lunch program

and the Diocese's participation in the E-Rate Program rendered the Diocese and GCCHS

recipients of Federal financial assistance.  Russo, 2010 WL 365679, at *4, 6.   While I am not

bound by the opinion of my district court colleague, I find his opinion on this issue well-

21

reasoned.  Therefore, I will adopt his holding that participation in the National School Lunch

Program and Federal E-Rate program constitute the receipt of Federal financial assistance.

Since I have held that the Diocesan elementary schools make up a school system with the

Diocese for purposes of Title IX, then, under <u>Russo</u>, if any schools within the Diocese or the

Diocese itself participates in the National School Lunch Program or the E-Rate Program, then all

of the schools, including Aquinas, and the Diocese are considered recipients of Federal financial

assistance.  Defendants admit that "[s]everal schools within the Diocese participate in the

National School Lunch Program" and that the Diocese, Aquinas and the other schools within the

Diocese participate in the federal E-Rate Program.  (Docket No. 69, at 12, 15; Docket No. 81, at

2.)  Accordingly, Defendants are recipients of Federal financial assistance and are subject to the

provisions of Title IX.

### B.  Defendants' Liability Under Title IX

Defendants initially argue that Plaintiffs' Title IX claim must fail because there is no

evidence of conduct of a sexual nature.  (Def. Br. at 4.)  Defendants correctly state that, in order

to fall within the purview of a Title IX claim for sexual harassment, as alleged by Plaintiffs, the

conduct must be of a sexual nature.  <u>See</u> <u>Doe v. North Allegheny Sch. Dist.</u>, 2011 WL 3667279,

at *7-8 (W.D. Pa. Aug. 22, 2011) (discussing nature of conduct subject to Title IX).  Jane Doe's

deposition testimony, as may well be expected of a seven year old child relating events that

occurred when she was five, is far from conclusive.  However, I do not believe, and Defendants

have provided no authority to suggest, that the sole manner in which sexual conduct can be

proven is through the testimony of a minor child.  The evidence submitted by Plaintiffs, through

Jane Doe's testimony, medical records, the testimony of Plaintiffs themselves and other family

members who interacted with Jane Doe during the period in question, raises a question of fact as

to whether sexual conduct may have occurred.  In so finding, I make no judgment as to the strength of such evidence.

As previously explained in connection with my opinion on the various motions to dismiss (Docket No. 46), the Third Circuit, relying on Supreme Court precedent, has held that "damages may not be recovered under Title IX for the sexual harassment of a student by one of the school district's teachers unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct."  Bostic v. Smyrna School Dist., 418 F.3d 355, 360 (3d Cir. 2005) (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1988)).  "Actual notice must amount to actual knowledge of discrimination in the recipient's programs."  Id. "Further, the response must amount to deliberate indifference to discrimination" – in other words, "an official decision by the recipient not to remedy the violation."  Id.  The Third Circuit has explained actual knowledge of discrimination to mean "knowledge of facts sufficiently indicating substantial danger to a student such that the institution can reasonably be said to be aware of the danger."  Bostic, 418 F.3d at 361.  "Actual knowledge cannot be based on a mere possibility."  Chancellor v. Pottsgrove Sch. Dist., 501 F. Supp.2d 695, 708 (E.D. Pa. 2007) (quoting Bostic, 418 F.3d at 361).  "[A] plaintiff in a Title IX damages suit. . .must prove actual knowledge of misconduct, not just actual knowledge of the risk of misconduct, and must also prove that the officials having that knowledge decided not to act on it."  Id. (quoting Delgado v. Stegall, 367 F.3d 668, 671-72 (7th Cir. 2004)(J. Posner)).

Applying this standard, courts have granted summary judgment in Title IX cases where the record established that the notice was insufficient to alert the defendants to the true nature of the wrongdoing.  In Gebser, the Supreme Court affirmed the lower courts' grant of summary

judgment dismissing a Title IX claim, holding that a complaint from parents of other students charging only that the [teacher] had made inappropriate comments during class was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." 524 U.S. at 291.  Moreover, "it is clear that actual notice requires more than a simple report of inappropriate conduct by a teacher."  Bennett v. PA Hosp. Sch. Of Nurse Anesthesia, 2002 WL 32341792, at *4 (E.D. Pa. 2002) (granting summary judgment dismissing Title IX claim where the plaintiff admitted that she had not elaborated on the inappropriate conduct and actions and comments).

Defendants argue that, based on the evidence presented, they did not receive actual notice of sexual harassment sufficient as a matter of law to establish liability under Title IX.  (Docket No. 69, at 17.)  I agree.  Examining the voluminous record herein and taking the facts in the light most favorable to Plaintiff, as I must on a motion for summary judgment, I find that Plaintiffs have not submitted sufficient evidence to create an issue of fact as to whether Defendants had actual knowledge of Deslam's alleged sexual harassment of Jane Doe, or then acted in deliberate indifference to this knowledge.

The record demonstrates that the Valeskys first reported an issue with Deslam's conduct to Rullo in September 2008, when they complained about Deslam instructing their daughter to eat her food in the lunchroom.  On September 26, 2008, Lisa Valesky submitted a BHI form stating that every day Deslam goes to Jane Doe's table at lunch, "touches her and goes through her lunch box," "tells her that she has to eat all of her food," and that Jane Doe is "terrified of him."[7]  William Valesky admitted that he did not believe that this BHI Form identified any

---

[7] Whether this form was actually submitted to and received by Rullo is a question of fact. For purposes of summary judgment, I will assume that it was submitted and received.

sexual misconduct of any kind.  Lisa Valesky also testified that, through early November, she believed that her daughter was upset because of what Deslam had been doing in the cafeteria.  In response, Rullo directed Deslam to stay away from Jane Doe in the cafeteria.

On or about November 11, 2008, the record reflects that, for the first time, the Valeskys made Rullo aware of their allegation that Deslam had been in the school restroom with Jane Doe and her classmates.  During a November 13 meeting with Rullo and Mahoney, the Valeskys told Rullo that Deslam had touched Jane Doe in the restroom, although they did not indicate that it was sexual in nature.  Lisa Valesky testified that at this time they were still trying to sort out what had occurred and that Jane Doe had not told them any further details.  The Valeskys filled out another BHI Form describing "inappropriate invasion of personal space" and that Deslam "was allegedly in the girls' restroom while [Jane Doe] was there.  He told her to eat her food at lunch."

On November 24, 2008, the Valeskys met with Bocan and expressed their concerns over Deslam telling students to eat their lunch and allegedly being in the bathroom with Jane Doe and other students.  In response to their allegations, Bocan had Deslam placed on administrative leave and directed Rullo to conduct an investigation.  On December 2, 2008, the Valeskys filed a complaint with the Greensburg Police Department.  On December 5, 2008, an anonymous person called Catholic Charities and *for the first time* indicated that Jane Doe had been sexually assaulted in the bathroom at Aquinas.  Persico, the Vicar General of the Diocese, received the message, spoke to the Valeskys, and then directed Bocan to immediately contact the Westmoreland County Children's Bureau.

As set forth in greater detail in Section II above, the record further reflects that the Greensburg Police Department, in conjunction with the Westmoreland County District

25

Attorney's Office, conducted an investigation of the allegations.  There is no evidence that Defendants failed to cooperate with the police investigation – indeed, the evidence demonstrates that the Defendants provided all the information requested by the police.  Deslam remained on administrative leave.  After the police and District Attorney's Office informed Rullo that Plaintiffs' allegations against Deslam were unfounded and that no charges would be filed against him, Rullo permitted Deslam to return to work at Aquinas.  Notably, Jane Doe had not attended school since November 6, 2008, well before the allegations of sexual abuse came to light.  However, at all relevant times, the Valeskys' two older children continued to attend Aquinas.  Even after Deslam's return, Plaintiffs continued to have their two older children attend Aquinas.

Thus, even considering the evidence in the light most favorable to Plaintiffs, Defendants initially received notice only relating to Deslam's behavior in the cafeteria.  Plaintiffs admit that there was nothing suggesting sexual harassment in those allegations.  The allegations were subsequently expanded to include Deslam's presence in the school bathroom with Jane Doe and several of her classmates.  While this might serve as constructive notice of possible sexual harassment, it is far from sufficient to constitute actual notice under Title IX.  See Vaird v. Sch. Dist. Of Philadelphia, 2000 WL 576441, at *3 (E.D. Pa. 2000) (holding that student's complaint regarding 'girls doing something 'nasty' in the girls' restroom' was insufficient to give the school district actual notice of alleged harasser's sexual propensity for assaulting her female classmates).  Indeed, the Valeskys testified that, at that point, they were still trying to sort out themselves what may have occurred.  Notwithstanding this lack of actual notice, the Diocese, from an abundance of caution, placed Deslam on administrative leave pending an investigation.  The first notice that Defendants received actually suggesting that anything of a sexual nature had occurred was through an anonymous call to Catholic Charities on December 5, 2005.  At that

time, the Diocese reported the allegations to the Westmorland County Children's Bureau and cooperated with the subsequent police investigation. Deslam remained on administrative leave until cleared by the police and District Attorney's Office.

I find that Plaintiffs' interpretation of these facts, colored by Lisa Valesky's *ex post facto* attempt to convey an understanding of the situation that she did not have at the time and which she clearly did not express to Defendants, is not consistent with the record. Rather, the record demonstrates that the Defendants responded appropriately to the allegations that they received, even suspending Deslam before the exact nature of the allegations became clear, that they cooperated in the police investigation and that they only permitted Deslam to return once the police department and District Attorney's Office had cleared him of wrongdoing. Under these circumstances, I find that Defendants did not have actual notice of sexual harassment at any time when Jane Doe was a student at Aquinas. When they were provided actual notice, a month after Jane Doe had been pulled from Aquinas by her parents, they acted appropriately in reporting the allegations to the Children's Bureau and cooperating in the criminal investigation. Under these circumstances, Plaintiffs have failed to raise an issue of fact with respect to Defendants' liability for sexual harassment under Title IX.

### C. Retaliation Under Title IX

In order to demonstrate a prima facie claim for retaliation under Title IX, a plaintiff must prove that: (1) she engaged in protected activity; (2) the funding recipient subjected her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. See Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp.2d 332, 374 (W.D. Pa. 2008) (citing Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001)). Defendants challenge all three prongs of the prima facie case.

The evidence submitted on summary judgment does not support a prima facie claim of retaliation.  Consistent with my determination that Defendants did not receive actual notice of sexual harassment until the December 2008 anonymous call to Catholic Charities, I also find that Lisa Valesky had not engaged in protected conduct as of November 19, 2008, when she purportedly was banned from Aquinas.  "A protected activity includes complaints of sexual discrimination to school authorities.  Not every complaint about unfair practices or perceived slights qualifies as protected activity.  The complaint 'must at a minimum convey the speaker's express or implicit protest of discriminatory practices that violate the federal antidiscrimination statutes.'" Cabrera-Diaz v. Penn Kidder Campus Jim Thorpe Area Sch. Dist., 2011 WL 613383, at *4 (M.D. Pa. Feb. 11, 2011) (quoting Curay-Cramer v. Ursuline Academy of Wilmington, DE, 450 F.3d 130, 135 (3d Cir. 2006)).  As of that date, the only complaints Lisa Valesky had made involved Deslam telling her daughter to eat her lunch and her daughter's statement that Deslam had been in the girls' restroom at the same time as she and her classmates were in the restroom.  These statements do not amount to a complaint of a Title IX violation.  Accordingly, Lisa Valesky has not established the first prong of her prima facie case of retaliation.

Moreover, it is not clear that Lisa Valesky suffered an adverse action for purposes of Title IX.  "A materially adverse action is one which well might have dissuaded a reasonable person from making or supporting a charge of discrimination." E.N. v. Susquehanna Twp. Sch. Dist., 2011 WL 3608544, at *16 (M.D. Pa. July 5, 2011) (Title VII jurisprudence is applicable to Title IX retaliation claim).  Lisa Valesky admitted in her deposition that the purported banishment from the school premises may have been her "misconception."  This interpretation is borne out by the letter Rullo sent to Lisa Valesky clarifying that Rullo "at no time stated that you were not welcome or permitted in the school."  The record reflects that Lisa Valesky was banned

28

solely from volunteering in the lunchroom, not from the school premises or any other volunteer

opportunities at the school.  Given the limited scope of Defendants' response, I find that it does

not rise to the level of a materially adverse action.  Compare Dawn L. v. Greater Johnstown Sch.

Dist., 586 F. Supp.2d 332, 377 (W.D. Pa. 2008) ("The Court finds that her loss of clearances and

subsequent denial of the ability to engage in volunteer activities within the District might well

have dissuaded a reasonable person in Dawn L.'s position – the position of someone who

devoted more time to volunteering than would be required of a full-time paid employee – from

engaging in the protected activity; the District's actions were therefore materially adverse.")

Even assuming that such a limitation on volunteer opportunities rises to the level of an

materially adverse action, Plaintiffs have submitted no evidence that it resulted from Lisa

Valesky's complaints relating to her daughter.  Plaintiffs rely on the purported temporal

proximity between the BHI Form filed by Lisa Valesky on November 13, 2008, and the date

when Lisa Valesky was informed that she would no longer be permitted to volunteer in the

lunchroom, five days later on November 18, 2008.  (Pl. Br. at 23-24.)  While this proximity,

without more, was sufficient to survive a motion to dismiss, a closer scrutiny of the evidence

submitted on summary judgment demonstrates that Rullo's decision to deny Lisa Valesky the

right to volunteer in the lunchroom, and the timing thereof, was not caused by Lisa Valesky's

complaints.  See Roy v. Continuing Care Rx, Inc., 2010 WL 5862864, at *10 n.4 (M.D. Pa. Oct.

7, 2010) ("In the case of claims for retaliation, the Third Circuit has found that although temporal

proximity between the protected activity and the alleged retaliatory action can be probative of

causation, where intervening acts occur that serve to support the employer's adverse employment

action, temporal proximity may be rendered insufficient to establish causation")(citing Thomas

v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)).

There is no dispute that an altercation of some sort occurred on October 22, 2008 between Lisa Valesky and a student, J.H., while Lisa Valesky was volunteering in the lunchroom.  At the time, Rullo was informed of the incident by Lisa Valesky personally and Rullo merely counseled her not to take student discipline into her own hands.  Lisa Valesky also informed J.H.'s mother that she had relayed the incident to Rullo.

However, J.H.'s parents heard a different version of the incident from their own daughter. They testified that they waited a couple of weeks, all the while expecting to be contacted by the school regarding the incident.  When Rullo did not call them to address it, and in light of their daughter's increasing distress, J.H.'s father reached out through a work colleague to Bocan on November 18, 2008.  Bocan immediately presented J.H.'s version of the October incident to Rullo, directed her to investigate, and stated that, if substantiated, Lisa Valesky should no longer be permitted to volunteer in the building.  Per Bocan's directive, Rullo conducted an investigation, interviewing the witnesses to the incident, and concluded that the incident, although more serious than had been described to her by Lisa Valesky, was also not a dire as Bocan had been told.  As a result, she mitigated the consequences suggested by Bocan and informed Lisa Valesky that she would no longer be permitted to volunteer in the lunchroom. When Lisa Valesky misconstrued her direction, she immediately wrote a letter clarifying the extent of the restriction.  These undisputed facts demonstrate that the temporal proximity relied upon by Plaintiffs arose from a call made by J.H.'s father to Bocan, not from any decision on the part of Defendants relating to Lisa Valesky's complaints.

Given that Lisa Valesky had not complained of a Title IX violation at the time of the purported retaliation, that the temporal proximity between her complaint and the purported retaliation is undermined by intervening events demonstrating causation, and that she has further

30

admitted that the nature of the purported adverse action was significantly more limited than had been alleged, I do not find that Lisa Valesky has met her burden of establishing a prima facie case of retaliation under Title IX.

### D.  Supplemental Jurisdiction

Plaintiffs' remaining claims for negligence per se, negligent failure to supervise, intentional infliction of emotional distress, battery and assault, and breach of contract all arise under state law.  "[A]bsent extraordinary circumstances, where the federal causes of action are dismissed the district court should. . .refrain from exercising [supplemental] jurisdiction."  Bright v. Westmoreland County, 380 F.3d 729, 751 (3d Cir. 2004).  Plaintiffs and Defendants have not submitted evidence of any such extraordinary circumstances, nor are any apparent to me.  Accordingly, I dismiss Counts II through IX without prejudice to refiling in state court.

## CONCLUSION

The Defendants' motion for summary judgment is granted dismissing Counts I and X with prejudice.  Counts II through IX are hereby dismissed without prejudice to refiling in state court.

## ORDER OF THE COURT

AND NOW, this 14th day of September, 2011, after careful consideration, and for the reasons set forth in the accompanying Opinion, Defendants' motion for summary judgment [Docket No 68] is granted.  Counts I and X of the Fourth Amended Complaint are dismissed with prejudice, and Counts II through IX of the Complaint are dismissed without prejudice to refiling in state court.

BY THE COURT:

/s/Donetta W. Ambrose
Donetta W. Ambrose
Senior U.S. District Judge